IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DIELECTRIC SOLUTIONS, LLC,

CIVIL DIVISION

No. 08-

Plaintiff,

v.

ISOVOLTA AG,  ISOFAB, INC.,

GERHARD SCHWANDER, AND

OLIVER STRASS,

Defendants.

## COMPLAINT

AND NOW comes Plaintiff, Dielectric Solutions, LLC ("DS"), by its undersigned counsel, and files the within Complaint against Defendants, Isovolta AG, Isofab, Inc., Gerhard Schwander and Oliver Strass, alleging as follows:

### JURISDICTION

1.     The jurisdiction of this court to adjudicate Plaintiffs' claims is premised upon: (a) 28 U.S.C. §§ 1331 and, in particular, the Sherman Act, 15 U.S.C. §§ 1 and 2, and the Patent Act, 35 U.S.C., which gives federal district courts jurisdiction to adjudicate these federal questions; (b) 28 U.S.C. §§ 2201 and 2202, which gives federal district courts jurisdiction to enter declaratory judgments; and (c) 28 U.S.C. § 1367(a), which invests the Court with supplemental jurisdiction to adjudicate Plaintiffs' related state law claims.  Jurisdiction also exists pursuant to 28 U.S.C. §1332 (diversity of citizenship), because Plaintiff and Defendants are citizens of different states and of

foreign countries, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

## VENUE

2. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because Plaintiff is located within the district and because a substantial part of the events giving rise to these claims occurred in this district.

## PARTIES

3. Plaintiff, Dielectric Solutions, LLC ("Dielectric Solutions" or "DS") is a Pennsylvania Limited Liability Company with its principal offices located in Kittanning, Pennsylvania.

4. Defendant, Isovolta, AG ("Isovolta") is a Corporation organized and existing under the laws of Austria.

5. Defendant, Isofab, Inc. ("Isofab") is a Corporation organized and existing under the laws of the State of Delaware. Isofab is the United States wholly owned subsidiary of Isovolta which was utilized by Isovolta for the purpose of investing in Dielectric Solutions.

6. Gerhard Schwander ("Schwander") is an indivual and citizen of Austria with a principal business address of A-2355 Wiener Neudorf, Austria.

7. Oliver Strass ("Strass") is an individual and citizen of Austria with a principal address of A-2355 Wiener Neudorf, Austria.

BACKGROUND

**Market for Mica Impregnated Fiberglass Fabrics**

8.      Dielectric Solutions is a manufacturer of, *inter alia*, woven fiberglass fabric, having certain unique electrical and mechanical properties that are used in the electronics and other industries ("DS Fabric") and, more particularly, also used in the production of mica tape for high voltage electrical insulation.

9.      The DS Fabric is manufactured by DS in two different sole categories, i.e. the under 40 grams per square meter category and over 40 grams per square meter.

10.      DS Fabric weighing less than 40 grams per square meter offers improvements over previously known electrical insulators.  This ultra-thin fiberglass fabric, with precise thickness tolerances and improved electrical and thermal insulation properties, was developed and introduced into the marketplace by DS in 2002.

11.      DS holds numerous trade secrets and patents related to the DS Fabric including the fabric weighing less than 40 grams per square meter.

12.      This ultra-thin fiberglass fabric is ideal for printed circuit boards and other electrical uses, permitting increased loads in the smaller spaces required for today's electronics.

13.      DS has been selling DS Fabric in the under 40 grams per square meter category to its customers for the production of mica tape since at least 2003.

14.      Isovolta is a manufacturer of, *inter alia*, mica tape and utilizes DS Fabric in the production of its products.

3

15.   Prior to its investment in DS, Isovolta was a customer of DS and purchased DS Fabric in the under 40 grams per square meter category.

16.   The geographic market for DS Fabric, as well as the production of mica tape, is worldwide.

**Isovolta and Isofab's Investment in Dielectric Solutions and Inequitable Conduct**

17.   On June 3, 2004, DS and Isovolta entered into a Supply Agreement whereby Isovolta obtained certain market exclusivity purchasing rights for DS Fabric in exchange for purchase volume commitments by Isovolta.   In this regard, limited exclusivity was granted to Isovolta to purchase its fabric for use in mica tape in the under 40 grams per square meter category through December 31, 2007.

18.   An existing customer of DS, Lectromat, had been using DS Fabric in the under 40 grams per square meter category to produce mica tape since March of 2003. To allow DS to continue to supply Lectromat with these products, the Supply Agreement specifically accepted sales of fabric in this category to this existing customer from the exclusive supply provisions of the Agreement.

19.   Unknown to DS, Isovolta intended to control the entire market for the sale of mica tape incorporating the patented DS Fabric.  In this regard, Isovolta, without the knowledge or consent of DS, filed a provisional patent in the United States Patent and Trademark Office on June 16, 2004 related to the use of DS Fabric in the production of mica tape and filed the application itself on September 3, 2005 at Serial Number 10/559/584.  Identical patent applications were filed by Isovolta in many other countries around the world.

20.     The provisional patent application and the subsequent patent application and supplements thereto were blatantly inappropriate in that the applications incorporated the prior art that was well known to Isovolta and, specifically, had been in use and production by Lectromat since 2003.

21.     Isovolta was specifically advised by DS, and was otherwise independently aware, that Lectromat had been utilizing the DS Fabric in creating mica tape since 2003 in the same manner as was described by Isovolta in its patent applications.

22.     DS did not learn of the filing of the patent application until 2006.  At that time, Isovolta, through Schwander and Strass, represented that the patent was for an application other than the application utilized by Lectromat and which had not been previously produced.

23.     In June of 2006, Isovolta formed Isofab and Isofab obtained approximately 45% of the ownership interest in DS.  Isofab has the right, pursuant to a sixth Amended and Restated Operating Agreement dated June 30, 2006, to appoint two of the five members of the Board of Managers of DS and the ability to block or control virtually all material actions by the Company.

24.     Schwander and Strass immediately became the individual representatives of Isofab, and Isovolta, on the DS Board of Managers.

25.     Isovolta promised to deliver a copy of the patent application to DS, but failed to do so until November 26, 2007.  When DS management learned of the content of the Isovolta patent application, it discovered that the patent application improperly describes the exact application of the DS product that had been utilized by its customer, Lectromat, since March of 2003.

5

Case 2:08-cv-02635-Document 1  Filed 11/26/2008 Page 6 of 18

26.    As part of the acquisition of the Isovolta/Isofab equity interest in DS, Isovolta agreed with DS to provide financing to DS for working capital, capital investment, as well as for the favorable lease of certain precious metals pursuant to a Preferred Unit and Secured Subordinated Note Purchase Agreement attached hereto as Exhibit "A," and made a part hereof.

27.    In this regard, DS and Isovolta entered into a Precious Metals Lease Agreement dated June 29, 2006 ("Precious Metals Lease"), pursuant to which the parties agreed to enter into individual lease agreements for successive terms the latest of which expires on November 27, 2008.  The parties agreed that Isovolta would continue to renew or otherwise finance the sub-leases of precious metals to DS, which it had leased for this purpose from Mitsubishi.

28.    The precious metals that are the subject of the Lease Agreement are formed into nozzles and used in the production of the DS fabric.  The DS Fabric cannot be made without the precious metals and nozzles.

29.    Because of Isovolta's control of DS by way of its exclusive purchasing rights, its financing arrangements, and its representation on the Board of Managers, the Precious Metals Lease is essential to the production of the DS Fabric.

30.    Also in June of 2006 contemporaneously with Isofab's investment in DS, DS and Isovolta entered into an Amended Supply Agreement pursuant to which the scope of the products for which Isovolta would have an exclusive right of supply was narrowed (i.e. DS could sell more products to other customers because sales of the under 40 grams per square meter category for mica tape was restricted from being sold to only four specific customers worldwide) and the purchasing volume required by

6

Isovolta was increased. A true and correct copy of the Amended Supply Agreement is marked as Exhibit "B," attached hereto and made a part hereof.

31.     Shortly after Isofab acquired its interest in DS and Schwander and Strass took their positions on the DS Board of Managers, Schwander and Strass, representing the interests of Isovolta and Isofab, began pressing DS not to sell fabric even in the over 40 grams per square meter category to Isovolta's competitors, including those not excluded in the Amended Supply Agreement. This was contrary to the best interest of and their fiduciary duties to DS and contrary to the terms of the Amended Supply Agreement.

32.     DS was not able to develop or approve a strategic plan for 2007 as a result of Schwander and Strass objections to plans to sell fabric in the over 40 grams per square meter category to competitors of Isovolta.

33.     In early 2007, Isovolta retaliated against DS for its efforts to sell fabric in the over 40 grams per square meter category to competitors of Isovolta by cutting off funding to DS for a period of time and; Schwander warned of future dire consequences, including the cancelation of all purchases, if the sales efforts were pursued.

34.     During the March 2007 meeting of DS managers, in an effort to negotiate peace with Isovolta and under great pressure from Schwander and Strass, DS agreed to suspend sales efforts of fabric in the over 40 grams per square meter category until March 2008 in exchange for an agreement from Isovolta to increase purchases of product.

35.     However, at the same time that the compromise was being reached, Isovolta was aggressively promoting its alleged patent (which had not been issued but

7

was applied for) with the intention of closing off opportunities for DS to sell its products to Isovolta's competitors in all weight categories. In this regard, Isovolta was telling its customers that its competitors could not sell the mica tape which included the DS Fabric as a result of the alleged patent. It further portrayed DS Fabric contained in the mica tape as its own exclusive product and assigned it a new trade name of "Powerfab."

36. In this same time frame, Isovolta also began to publish its ownership interest in DS in order to dissuade its competitors from relying upon a supply of the DS fabric products and it falsely communicated to customers and competitors that it had purchased "control" of DS.

37. At a DS Board meeting on September 26, 2007, Schwander hand-delivered a letter to the DS Board, which referred to the patent application and warned DS that Isovolta would "protect this patent against everybody who will violate it." In the Board discussions that followed at the September meeting as well as the November 26, 2007 meeting, Schwander and Strass did the following:

i.    Advised that Isovolta intended to pursue legal action to protect the patent;

ii.    Demanded information about potential sales of products to competitors even though the sales were not prohibited by the Amended Supply Agreement; and

iii.    Threatened legal action against DS and Isovolta's competitors if sales occurred to these entities.

A true and correct copy of a letter dated September 24, 2007 is marked as Exhibit "C," attached hereto and made a part hereof.

8

39.     Isovolta failed to increase its level of purchases of DS fabric as agreed in March of 2007 Board Meeting and, in fact placed erratic orders and eventually began to reduce purchases, and delay payments, thereby causing extreme financial hardship to DS.

40.     Isovolta has failed and refused to compensate DS for increases in its costs as required by the various agreements with DS and has gone so far as to reject shipments of products that were shipped under the assumption of a modest price increase which caused further financial hardship to DS.

41.     Isovolta and Isofab have been pursuing a strategy to acquire the DS Fabric intellectual property as well as the DS manufacturing assets in order to monopolize the market for the sale of mica tape produced from DS Fabric and for far less than fair value.  This course of conduct, pursued in the persons of Schwander and Strass, was to the substantial detriment of the other interest holders of DS.  These improper efforts have paid off for Isovolta.  In early 2008, DS was informed by competitors of Isovolta of their intention to cancel plans to purchase product from DS due to the threat of legal action.

42.     Schwander and Strass, acting on behalf of Isovolta and Isofab and contrary to their fiduciary duties as members of the Board of Managers to DS, have threatened and caused economic harm to DS, including withholding financing and purchase orders in contravention of the Amended Supply Agreement, the Loan Agreement and the agreement to increase purchases.  Isovolta has carried out these threats.

43.     Schwander and Strass have expressly admitted that their personal strategy is to force DS into bankruptcy where they believe Isovolta and Isofab can acquire the above-referenced assets of DS at less than fair value if a "voluntary" agreement cannot be reached.

44.     On November 20, 2008, during a meeting of the DS Board of Managers, Schwander and Strass hand-delivered a letter to the other members of the DS Board which purported to terminate the Precious Metals Lease Agreement and advised that DS would no longer have the ability to use the essential precious metals in the production of its products after November 27, 2008.    A true and correct copy of the Letter is Marked as Exhibit "D," attached hereto and made a part hereof.

45.     After the meeting on November 20, 2008, Schwander advised DS management that with the termination of the precious metals lease, DS would be forced to agree to the sale on Isovolta's terms or file for bankruptcy.

46.     Without the precious metals, DS will be unable to produce DS Fabric for sale to competitors of Isovolta.

47.     Other customers of DS for DS Fabric have indicated that they are willing to purchase DS products for the production of mica tape only if the threats of Isovolta's legal action in connection with its invalid patent applications are withdrawn. Isovolta has refused to withdraw these threats in furtherance of its scheme to stifle competition for its own benefit and to the substantial detriment of DS.

48.     DS management, in light of the stranglehold placed upon DS by Isovolta, Isofab, Schwander and Strass, has offered to sell the DS assets for fair value on the open and competitive market.  The Defendants have collectively thwarted that effort in

10

pursuit of their above-stated improper goals as such an action requires approval of Schwander and Strass as Board Members.

## COUNT I

## DECLARATORY JUDGMENT

49.    Isovolta's provisional patent application, and the continuations thereto, filed with the United States Patent and Trademark Office on June 16, 2004, describe a process that was the subject of prior art of applying the DS Fabric to produce mica tape.

50.    Specifically, the patent application describes the use of DS fabric in production of the mica tape that had been utilized by customers of DS since at least March 2003.

51.    Isovolta was advised by DS management that a DS existing customer was utilizing this process prior to June 16, 2004.

52.    Isovolta was otherwise aware of the prior art before June 16, 2004.

53.    Isovolta's fling of the provisional patent on June 16, 2004, the application on September 3, 2004 and the filing of continuations thereto, with the knowledge of the prior art were acts of inequitable conduct pursuant to Title 35 of the United States Code and Rule 56 in particular. 37 C.F.R. §1.56.            .

54.    DS has a substantial interest in the patent application as it relates to DS Fabric and the Defendants have used, and are using, the patent application to prevent sales of the DS fabric to customers of DS.

55.    An actual controversy exists, pursuant to 28 U.S.C. § 2201, within the jurisdiction of this Honorable Court, between DS and Isovolta as the existence of prior art and the invalidity

11

of the patent application.

56.     DS is entitled to a Declaratory Judgment that: (1) the patent application has as its subject prior art; (2) the filing of the patent application was inequitable conduct in connection with the patent application; and (3) any patent that would be issued as a result of the application would be invalid.

WHEREFORE, Plaintiffs respectfully pray that this Honorable Court:

a.     Enter a declaratory judgment declaring that: (1) the patent application has as its subject prior art; (2) the filing of the patent application was inequitable conduct in connection with the patent application; and (3) any patent that would be issued as a result of the application would be invalid:

b.     Award Plaintiffs their costs in this proceeding, including the payment of reasonable attorney's fees; and

c.     Grant such other and further relief as is deemed appropriate.

## COUNT II

## VIOLATONS OF SHERMAN ACT

57.     By virtue of the conduct described above, Isovolta and Isofab, individually and in concert, have willfully attempted to acquire and exercise monopoly power in the relevant market for high end mica tape for next generation electrical devices in violation of Section 2 of the Sherman Act (15 U.S.C. §2).

58.     By virtue of the conduct described above, Isovolta and Isofab have willfully combined and conspired to unreasonably restrain trade and commerce in the relevant market for high end mica tape for next generation electrical devices in violation of

Section 1 of the Sherman Act (15 U.S.C. §1) and have acted and contracted to implement the combination and conspiracy to restrain trade and commerce

59.    Defendants, Isovolta and Isofab, have agreed between themselves and with co-conspirators of each of them, including Schwander and Strass, and have acted in concert with one another and the other conspirators to prevent the manufacture, restrain trade, prevent competition and control the prices of high end mica tape for next generation electric devices using DS Fabric.

60.    Defendant Isovolta controls the essential facility to produce the DS Fabric in the form of the Precious Metals Lease and are attempting to gain monopoly control of the relevant market by forcibly gaining control over DS and its technology's, and thereby preventing DS from selling products to Isovolta's competitors.

61.    Defendant, Isovolta has interfered with the contractual relationships of DS and its other customers and has undermined the efforts of DS to acquire additional customers.

62.    Section 4 of the Clayton Act (15 U.S.C. §15(a)) authorizes private suits for damages based upon violations of the Sherman Act.

63.    As a result of Isovolta's unlawful and anticompetitive conduct, DS has suffered injury to its business in the form of lost sales of mica fabric and have otherwise impaired the business, growth and development of DS, and DS seeks recovery of the lost profits that it would have earned but for the unlawful and anticompetitive conduct of Isovolta, treble damages and attorneys' fees.

WHEREFORE, Plaintiff respectfully prays that this Honorable Court enter judgment in its favor and against Defendant, Isovolta, in the amount of three times its

lost profits and other damages trebled, plus attorneys' fee and expenses, as a result of Isovolta's violation of the Sherman Act.

## COUNT III

## BREACH OF FIDUCIARY DUTY

64.     As members of the DS Board of Managers, Schwander and Strass, owe fiduciary duties to DS and must perform their duties with individual loyalty and in good faith and in a manner which they reasonable believe to be in the best interests of DS.

65.     Contrary to these fiduciary duties, Schwander and Strass, as described above, have seized and diverted the corporate opportunities of DS and have otherwise acted in the utmost bad faith to the detriment of DS and to their own personal benefit and the benefit of Isovolta and Isofab.

66.     The actions of Schwander and Strass have been willful, wanton, and malicious thereby warranting the imposition of punitive damages.

WHEREFORE, Plaintiff respectfully prays that this Honorable Court enter judgment in its favor and against Defendants, Schwander and Strass, in the amount of its lost profits and other damages, including attorneys' fee and expenses as well as for punitive damages.

## COUNT IV

## BREACH OF CONTRACT

67.     Defendant, Isovolta, breached the limitations under the Amended Supply Agreement, by exercising control over, and interfering with the sale of DS Fabric to customers that were not excluded the Agreement.

14

68.     Defendant, Isovolta, has breached the covenant of good faith and fair dealing in the Amended Supply Agreement by its actions above-detailed.

69.     Defendant, Isovolta has breached its agreement to increase purchases of DS Fabric that was made in exchange for the delay of sales to its competitors.

70.     Defendant, Isovolta has breached the terms of the Note Purchase Agreement and all related collateral agreements, including the covenant of good faith and fair dealing, by attempting to terminate the Precious Metals Lease, filing a fraudulent patent application and interfering with sales of DS products.

WHEREFORE, Plaintiff respectfully prays that this Honorable Court enter judgment in its favor and against Defendants, Schwander and Strass, in the amount of its lost profits and other damages, including attorneys' fee and expenses.

## COUNT V

## INTENIONAL INTERFEREANCE WITH CONTRACTUAL RELATIONS

71.     All Defendants have conspired and acted to interfere with the contractual relationships between DS and its customers.

72.     This interference has caused damages in the form of lost sales.

WHEREFORE, Plaintiff respectfully prays that this Honorable Court enter judgment in its favor and against Defendants, Schwander and Strass, in the amount of its lost profits and other damages, including attorneys' fee and expenses.

## COUNT VI

## INTENTIONAL INTERFERENCE WITH PROSPECTIVE CONTRACTUAL RELATIONS

73.     Defendants have conspired and acted to interfere with the contractual relationships between DS and its potential future customers.

15

74.    This interference has caused damages in the form of lost sales.

WHEREFORE, Plaintiff respectfully prays that this Honorable Court enter judgment in its favor and against all Defendants in the amount of its lost profits and other damages, including attorneys' fee and expenses.

Respectfully submitted,

STRASSBURGER McKENNA
   GUTNICK & GEFSKY

By:   /s/ Joseph R. Lawrence

Firm I.D. No. 278
Joseph R. Lawrence
PA I.D. No. 65709
jlawrence@smgglaw.com
E. J. Strassburger, Esquire
Pa. I.D. No. 10231
ejstrass@smgglaw.com

Four Gateway Center, Suite 2200
444 Liberty Avenue
Pittsburgh, PA 15222
(412) 281-5423 — Telephone
(412) 281-8264 — Facsimile

Attorneys for Plaintiff

Dated: November 26, 2008

16